**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Farnam Companies, Inc., ) | No. CV 05-1520-PHX-NVW |
| Plaintiff, ) | **ORDER** |
| vs. ) | |
| Stabar Enterprises, Inc., ) | |
| Defendant. ) | |

    The court has considered Stabar's Partial Motion To Dismiss Or, In The Alternative, For Summary Judgment Regarding Counts 3-7 (doc. # 39) ("Stabar Motion"), Statement Of Facts In Support Of Stabar's Partial Motion To Dismiss Or, In The Alternative, For Summary Judgment Regarding Counts 3-7 (doc. # 38) ("Stabar SOF" and "Stabar SOF Ex."), Farnam's Response To Stabar's Partial Motion To Dismiss Or, In The Alternative, For Summary Judgment Regarding Counts 3-7 And Farnam's Cross-Motion For Summary Judgment (doc. # 59) ("Farnam Response" or "Farnam Motion" as appropriate), Farnam's Controverting And Separate Statement Of Facts In Support Of Farnam's Response To Stabar's Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment And Farnam's Cross Motion For Summary Judgment (doc. # 60) ("Farnam CSOF" and "Farnam SOF" as appropriate), Exhibit List To Farnam's Controverting And Separate Statement Of Facts In Support Of Farnam's Response To Stabar's Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment And Farnam's Cross-Motion For Summary Judgment (doc. # 62)

1  ("Farnam SOF Ex." or "Farnam CSOF Ex."), and Defendants' Response To Plaintiffs' Cross-
2  Motion For Summary Judgment And Reply In Support Of Their Partial Motion To Dismiss
3  Or, In The Alternative, For Summary Judgment Regarding Counts 3-7 (doc. # 69) ("Stabar
4  Reply" or "Stabar Response" as appropriate), Supplemental Statement Of Facts In Support
5  Of Defendants' Response To Plaintiffs' Cross-Motion For Summary Judgment And Reply
6  In Support Of Their Partial Motion To Dismiss Or, In The Alternative, For Summary
7  Judgment Regarding Counts 3-7 (doc. # 67-1) ("Stabar SSOF") and exhibits thereto (doc. #
8  67-2 through 67-13) ("Stabar SSOF Ex."), and Farnam's Reply In Support Of Its Cross-
9  Motion For Summary Judgment Re Counts 3-7 (doc. # 77).

10  Farnam Companies, Inc. ("Farnam") brought this action against Stabar Enterprises,
11  Inc. ("Stabar") after this court denied Farnam's untimely motion to amend its complaint in
12  a parallel action by Farnam against Stabar. (Case # 03-CV-0503-NVW, doc. # 114.) Stabar
13  now moves to dismiss for failure to state a claim or alternatively for summary judgment as
14  to Counts 4-7 of Farnam's Complaint, which allege unfair competition, fraud, negligent
15  misrepresentation and innocent misrepresentation, and as to Count 3, which seeks a
16  declaratory judgment that Farnam did not breach the parties' license agreement. Farnam
17  cross-moves for summary judgment in its favor on the same five counts.

18  **I.     Background**

19  The following background is set forth in the Complaint.

20  Barbara Allen and her husband Stacy Allen formed Stabar, a corporation which
21  markets, distributes and outsources the manufacture of nutritional supplements for pets.
22  (Complaint at ¶ 6; Farnam Response at 3.)  The parties, for the purpose of this motion, have
23  treated the Allens and Stabar interchangeably. Stabar's principle products, the "Shed-Stop"
24  line, are supplements designed to prevent pet shedding. (Complaint at ¶ 6.) The secret
25  formula for Shed-Stop was invented 300 years ago by Barbara Allen's ancestors and was
26  passed down to Barbara in the 1980s. (Complaint at ¶¶ 14-17.) The Allens formed Stabar
27  in 1994 as a vehicle to bring this ancient formula to market. (Complaint at ¶ 18.)

28

Barbara Allen submitted a patent application for Shed-Stop in 1998 and at the same time assigned her rights in the application to Stabar. (Complaint at ¶¶ 25-26.) In the application Barbara Allen did not disclose the formula, even though she knew she had a duty to do so. (Complaint at ¶¶ 27, 30-31.) Nor did Barbara Allen disclose that at the time, Shed-Stop had been on sale for over 2.5 years. (Complaint at ¶ 28.) Barbara Allen swore to the Patent Office that she was the "original, first and sole inventor" of the Shed-Stop formula. (Complaint at ¶ 29.)

In 1999, Farnam entered negotiations with Stabar to license the rights to Stabar's products and Shed-Stop in particular. (Complaint at ¶ 41.) During negotiations Barbara Allen and Stabar made various representations to Farnam about the patent. Barbara Allen and Stabar told Farnam that Stabar had just been granted a patent on the Shed-Stop formula and that "one cease and desist letter from Stabar's patent attorney should close the competition down." (Complaint at ¶¶ 42, 46.) Stabar also submitted to Farnam a business plan indicating that "Stabar's patent application for the Shed-Stop formula was recently approved by the U.S. Patent Office" and that "the value of this patent in providing licensing opportunities and protecting against knock-offs can hardly be overstated." (Complaint at ¶ 44.)

At no time during the negotiations did Stabar or Barbara Allen disclose that Barbara Allen was not the inventor of Shed-Stop, that the formula was on sale for over 2.5 years before Barbara Allen had filed the patent application, that the Shed-Stop patent did not disclose the best mode of making Shed-Stop, or that Barbara Allen had failed to tell the Patent Office these facts. (Complaint at ¶ 61.) The parties entered a license agreement ("License Agreement") at the close of these negotiations on March 17, 2000, in which Farnam paid $500,000 in license acquisition fees and $500,000 in prepaid royalties, thereby obtaining inter alia the exclusive right to practice Stabar's patent. (Complaint at ¶ 52.)

Pursuant to the license's termination clause, Stabar terminated the License Agreement on November 24, 2002, allegedly for prior breaches of the agreement by Farnam. (Complaint at ¶¶ 65-66.) Farnam thereafter brought suit, which was removed to federal court

1   on March 13, 2003. (Complaint at ¶ 71; 03-CV-0503-NVW.) After discovery, Farnam filed
2   a Motion To Amend Its Complaint on February 15, 2005, seeking to add claims of patent
3   invalidity and unenforceability, fraud and misrepresentation, and other claims. (Complaint
4   at ¶ 73.) The court denied the motion to amend and Farnam filed this new action asserting
5   some of those same claims. (Complaint at ¶¶ 73-74.)

6   The court previously awarded Farnam a final and enforceable summary judgment on
7   its claim that Stabar's patent was invalid, without opposition from Stabar. (doc. # 48.) The
8   court issued a declaratory judgment that Stabar's patent is invalid (1) under 35 U.S.C. § 112
9   for failing to disclose what the named inventor considered the best mode for making the
10  claimed invention and (2) under 35 U.S.C. § 102(b) because the product was on sale more
11  than one year before the application was filed. (doc. # 61.)

12  **II.     Legal Standard**

13  The court may not dismiss a complaint for failure to state a claim "unless it appears
14  beyond doubt that the plaintiff can prove no set of facts in support of his claims which would
15  entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994). "Dismissal can
16  be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged
17  under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th
18  Cir. 1988). When analyzing a complaint for failure to state a claim, all factual allegations
19  are taken as true and construed in the light most favorable to the nonmoving party. *See Iolab
20  Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994). The court must assume that
21  all general allegations "embrace whatever specific facts might be necessary to support them."
22  *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994). The court does
23  not need to assume, however, that the plaintiff can prove facts different from those alleged
24  in the complaint. *See Associated Gen. Contractors of Cal. v. Cal. State Council of
25  Carpenters*, 459 U.S. 519, 526 (1983).

26  With regard to the parties' motions for summary judgment, the moving party bears the
27  initial burden of informing the court of the basis for its motion, and identifying those portions
28  of the pleadings, depositions, answers to interrogatories, and admissions on file, together

1   with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of
2   material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving
3   party has met its initial burden with a properly supported motion, the party opposing the
4   motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set
5   forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at
6   248. Summary judgment is appropriate against a party who "fails to make a showing
7   sufficient to establish the existence of an element essential to that party's case, and on which
8   that party will bear the burden of proof at trial." *Id.* at 322. *See also Citadel Holding Corp.
9   v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). Although the initial burden is on the movant to
10  show the absence of a genuine issue of material fact, this burden may be discharged by
11  indicating to the court that there is an absence of evidence to support the nonmoving party's
12  claims. *See Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 193 n.2 (3d Cir. 2001).
13       Before the court are Stabar's motion to dismiss the Complaint or, in the alternative,
14  for summary judgment, as well as Farnam's motion for summary judgment.

15  **III.   Rule Precluding Post-Hoc Recoupment Of Royalties**

16       Stabar moves to dismiss Counts 4-7 on the ground that these claims are barred by the
17  rule against recoupment of royalties paid under a license. The general rule is that a patent
18  licensee may not recoup those royalties paid under the license before the licensee
19  affirmatively declares the patent invalid or otherwise seeks a determination of the patent's
20  invalidity. *Bristol Locknut Co. v. SPS Techs., Inc.*, 677 F.2d 1277, 1283 (9th Cir. 1982);
21  *Rite-Nail Packaging Corp. v. Berryfast, Inc.*, 706 F.2d 933, 936 (9th Cir. 1983). The rule is
22  based on the federal "policies favoring early adjudication of patent validity and
23  encouragement of the use of the patent system by protecting the security of royalty income."
24  *Transitron Elec. Corp. v. Huges Aircraft Co.*, 649 F.2d 871, 874 (1st Cir. 1981). The rule
25  is subject to an exception which Stabar contends applies in this case. "The exception occurs
26  when a patent holder has induced the licensee to enter into the license agreement through
27  fraud; in such event, the licensee is entitled to restitution of his royalty payments."
28  *Transitron*, 649 F.2d at 874. As described by the court in *Transitron*,

> The fraud exception does no violence to the policies [behind the rule against recoupment]. It does not unduly burden a patent holder's reasonable expectations since fraud, if ever alleged, would have to be proven by clear and convincing evidence, and the patent holder would have to be proven not merely careless but to have intended to deceive. An honest patentee, therefore, will have little to fear, while a dishonest patentee can scarcely complain if later stripped of ill-gotten gains.

*Id.* at 875 (internal citations omitted). The fraud, moreover, must involve nothing less than knowing and deliberate conduct and must have been perpetrated against the licensee, not merely against the Patent Office. *Id.* at 876.

The Complaint alleges that Stabar and Barbara Allen knew the patent was invalid and unenforceable while negotiating the License Agreement with Farnam. (Complaint at ¶ 104.) Intending for Farnam to rely upon the representations, Stabar submitted to Farnam a business plan indicating that "Stabar's patent application for the Shed-Stop formula was recently approved by the U.S. Patent Office" and that "the value of this patent in providing licensing opportunities and protecting against knock-offs can hardly be overstated." (Complaint at ¶¶ 44, 105.) The Complaint also alleges that Stabar represented to Farnam that the patent was valid, while knowing otherwise. (Complaint at ¶¶ 102, 104.)

In this court's order of May 17, 2005, in case # 03-CV-503 denying Farnam's motion to amend, this court noted its skepticism about treating a patent licensor's failure to disclose its patent's invalidity as fraudulent inducement of a license agreement, such that the licensee could recoup royalties paid before asserting the patent's invalidity. (03-CV-503, doc. # 114 at 3.) However, this court did not rest its ruling denying amendment on that skepticism. (03-CV-503, doc. # 114 at 4.)

Upon closer examination of Farnam's principal case, *Ampex Corp. v. Memorex Corp.*, 1980 U.S. Dist. LEXIS 12068, C-74-2349 at *12 (N.D. Cal. Feb. 1, 1980), this court concludes that it is in fact an example of recoupment for fraud in the inducement. There the patent licensee investigated potential patent invalidity, and the patentee withheld the information from which the invalidity would have been discovered. Perhaps the allegations of this case that Stabar knew its patent was invalid fall short of that kind of concealment; but

- 6 -

the similarity between *Ampex* and this case is too great for this court to undertake to resolve the sufficiency of that similarity unless necessary to rule on these motions.

Because Stabar is entitled to a stay and alternatively summary judgment on other grounds, the court need not decide whether Farnam has sufficiently stated a claim for recoupment.

## IV.     Waiver By Failing To Bring Claims In The 2003 Suit

Stabar alleges that Farnam has waived its claims by failing to bring them as compulsory counterclaims in the original 2003 suit between these parties as required by Rule 13(a), Fed. R. Civ. P. (Stabar Motion at 8-9.) Farnam responds that Stabar's prior counsel, Mr. Lucia, waived Stabar's Rule 13 rights at oral argument on April 1, 2005. (Farnam Response at 9.) It is undisputed that Mr. Lucia waived at least some of Stabar's rights under Rule 13(a) on that date; the only issue is the scope of that waiver.

### A.     Factual Context

The April, 2005 oral argument related to Farnam's Motion To Amend the Complaint in the 2003 case between these parties. Farnam moved to incorporate eight additional counts into its complaint, including fraud and invalidity of the patent. (*See* 03-CV-0503, doc. # 114.) Stabar opposed the amendment, given the extention of discovery that would inevitably result from amending (*see, e.g.*, Stabar SSOF Ex. 2 at 62:12-16), but sought in the alternative to be allowed itself to amend its countercomplaint against Farnam to add a Lanham Act claim. (*Id.* at 47:10-15.)

The relevant exchange began as follows. Mr. Lucia argued that the 2003 case was basically a contract case that would not be affected by a declaration of patent invalidity and that the court should deny Farnam's motion to amend as well as Stabar's own motion in the alternative to amend. During the discussion allegedly constituting a waiver, both the court and Mr. Lucia referred only to a single patent invalidity claim, as opposed to various claims:

> MR. LUCIA: . . . . But what I'm saying is, now that they have moved to amend past the deadline, what we're saying is well, if you are going to get to amend, we should get to amend also.

>THE COURT: If they -- if I open the door for them you want to walk through as well.
>MR. LUCIA: That's correct. But what I really expect is that because we're both way beyond, by more than a year, the deadline to amend, you should deny both motions. And -- I mean, this case is complicated enough already. To add to it the validity of the patent, more expert testimony, no possibility of trying to dispose of this claim by April 22, it just means the trial is going to get even more complicated and probably be postponed.
>THE COURT: If I deny their motion to amend *and the patent invalidity is not adjudicated in this case*, and we go to judgment here in due course, you will not be contending that there is any claim or issue of preclusion that would preclude them from bringing *such a claim* in a separate action, will you?
>MR. LUCIA: That's right. I mean I don't know if the period of limitations might run, but even if that's the case.

(Stabar SSOF Ex. 2 at 47:10-48:5 (emphasis added).) The court spoke then with Farnam's counsel on the issue, and Farnam's counsel mentioned a potential fraud claim. (*Id.* at 49:15-50:1.) Nevertheless, the court and Mr. Lucia continued to speak only in terms of a single claim for patent invalidity:

>THE COURT: . . . But let me ask you, Mr. Lucia, if I did decide to grant their motion, how much additional discovery would fairly be needed and how much time to do it.
>MR. LUCIA: It's going to take re-deposing everyone.
>THE COURT: Well, that doesn't sound right to me. It sounds to me like you would need to go into *those specific facts they have articulated that go to their grounds of invalidity.* And that would have to do with when they first commercially used this, whether it was more than a year before their application. They seem to be rather discrete facts. . . .
>. . . .
>MR. LUCIA: . . . But if we're going to add in this claim, we're going to have to go another three or four months of discovery and then have dispositive motions at the end of the summer and then try the case well into next year. And the better way to solve this would be to stay on schedule in this case, *and if they want to sue us to declare the patent invalid, they can do that at some point in the future and have that on its own schedule.*

(*Id.* at 61:24-63:10 (emphasis added).) Thereafter Mr. Lucia made his only arguably ambiguous statement: "But there's nothing wrong with both sides filing these amendments as new lawsuits and we'll have a different lawsuit." (*Id.* at 66:13-15.) The court then explicitly discussed the Rule 13 waiver situation with Mr. Lucia, who affirmed Stabar's waiver:

- 8 -

> THE COURT: Well, there is [a problem] – it does seem to me that if these grounds for invalidity would be lawful defenses to your action on the licensing agreement, then it is clearly encompassed within the transaction or occurrence that is the subject of this lawsuit. And unless you waive it, and perhaps you already have, a separate action would be barred by an a adjudication in this case.
> 
> Now, the rules of merger and bar can be waived. And the answers you gave to my earlier question probably are a waiver. But for your waiver, it sounds like that is a defense to this action. If they are right about the law, and as I told you I will go read those cases today. All right.
> 
> Anything further?
> 
> MR. LUCIA: No. I don't see why they can't bring a lawsuit *to declare the patent illegal,* because that has not been an issue in this case since we dismissed our infringement case.
> 
> THE COURT: Okay.
> 
> MR. LUCIA: The Lanham Act, that hasn't been part of this case at all until we now moved to amend. So if it's not granted to be added to this case there's no reason why we can't sue for it separately.

(*Id.* at 66:16-67:12 (emphasis added).) Only later in the discussion did Farnam's counsel bring up the fraud claim:

> MR. CLAUSEN: . . . With, respectfully, with that, there is also a claim of fraudulent inducement, which would require additional discovery as to the reliance upon and the materiality of the patent at issue here.
> 
> THE COURT: Indeed. *I have overlooked that one.*
> 
> MR. CLAUSEN: *I didn't think it was expressed at this point.*
> 
> THE COURT: That claim is that the fraudulent inducement was the representation that there was a patent for the Stop-Shed.
> 
> MS. CATALFIO: Your Honor, if I may answer.
> . . .
> THE COURT: All right. Well, as I said, I'm going to take this under advisement. I will look at those cases. . . .

(*Id.* at 69:12-70:15 (emphasis added).)

**B.    Waiver Analysis**

"[A] waiver is a voluntary and intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right." *Guarantee Title & Trust Co. v. Babbitt Bros. Trading Co.*, 47 Ariz. 47, 53, 53 P.2d 734, 736 (1936); *Kontrick v. Ryan*, 540 U.S. 443, 458 (2004) ("[W]aiver is the intentional relinquishment or abandonment of a known right." (internal quotations and citations omitted)). The

- 9 -

1 circumstances do not support a finding that Stabar knowingly or intentionally relinquished
2 its rights under Rule 13 with respect to claims other than for declaration of patent invalidity.

3     Mr. Lucia only spoke of a single claim of patent invalidity, as opposed to plural
4 "claims," which might include fraud, unfair competition or negligent misrepresentation.
5 After the waiver discussion with the court, Mr. Lucia was very precise in explaining exactly
6 what rights Stabar was waiving, clarifying that the waiver was for a patent invalidity case.
7 At that point the discussion had been curtailed by the court, yet Mr. Lucia conscientiously
8 ensured that the record related his clarified intentions.

9     The court itself also spoke only of a single "claim," buttressing Mr. Lucia's
10 understanding about the scope of the discussion despite Farnam's references to the fraud
11 claim. The court even went so far as to clarify to Mr. Lucia that the amount of additional
12 discovery the claim would add in the 2003 suit would be limited to depositions related to
13 Farnam's specific grounds of patent invalidity, as opposed to Stabar having to re-depose
14 everybody. Later, the court demonstrated that Mr. Lucia's understanding about the scope of
15 the waiver was accurate, noting that the court had only considered during the waiver
16 discussions a patent invalidity claim and not the parallel fraud claim. Most tellingly,
17 Farnam's counsel concurred that the discussion up to that point – which included Mr. Lucia's
18 waiver – had not dealt with the fraud claim.

19     In light of the foregoing, the single ambiguous statement made by Mr. Lucia can only
20 be reasonably read to refer to the claim of patent invalidity. The court therefore concludes
21 that Stabar did not waive its Rule 13 rights to these other claims.

22     **C.**    **Application Of Rule 13**

23     Having determined that Mr. Lucia did not waive Stabar's Rule 13 rights as to the other
24 claims, the court must decide the effect of Rule 13 in these circumstances. While there is
25 variation among courts as to the proper disposition under such circumstances, *see* Robin
26 Cheryl Miller, J.D., Annotation, *Effect of Filing as Separate Federal Action Claim That*
27 *Would Be Compulsory Counterclaim in Pending Federal Action*, 81 A.L.R. Fed. 240 (1987);
28 W. R. Habeeb, Annotation, *Failure to Assert Matter as Counterclaim as Precluding*

1 *Assertion Thereof in Subsequent Action, Under Federal Rules or Similar State Rules or*
2 *Statutes*, 22 A.L.R.2d 621 (1952), Farnam has not disputed Stabar's assertion that absent
3 waiver, Rule 13 is a bar to these claims. Some authority supports dismissal as the proper
4 disposition. *See United States v. Eastport Steamship Corp.*, 255 F.2d 795, 802 (2d Cir. 1958)
5 (holding that Rule 17(a) of the Court of Claims, which is modeled after Rule 13(a), allows
6 for dismissal of claims in a second suit that should have been brought as compulsory
7 counterclaims in the first suit, even though the first suit had not yet come to judgment);
8 *Republic Telcom Corp. v. Telemetrics Communications, Inc.*, 634 F. Supp. 767, 768 (D.
9 Minn. 1986) ("The general rule is that when an action before a court involves a claim that
10 should be a compulsory counterclaim in another pending federal suit the court should stay
11 its own proceedings *or dismiss the claim.*" (emphasis added) (internal quotations omitted)).
12 A more conservative approach is to stay the claims in the second suit that should have been
13 brought in the first. *See Republic Telecom*, 634 F. Supp. at 768 (staying claims in the second
14 action); *Donnkenny, Inc. v. Nadler*, 544 F. Supp. 166, 170 (S.D.N.Y. 1982) (same); White
15 Motor Corp. v. Int'l Union, 365 F. Supp. 314, 317 (S.D.N.Y. 1973) (same); *Republic*
16 *Precious Metals, Inc. v. Republic Precious Metals Corp.*, 575 F. Supp. 1256, 1259 (D. Minn.
17 1984) (same); *see also Seattle Totems Hockey Club v. Nat'l Hockey League*, 652 F.2d 852,
18 856 (9th Cir. 1981) (upholding injunction against prosecution of claim in foreign court that
19 should have been brought as compulsory counterclaim in then-pending suit). The court
20 concludes that a stay of later-filed claims that are compulsory counterclaims in an earlier-
21 filed action is the appropriate course of action.

22 Farnam's Count 3 will be stayed to await a final judgment in the 2003 action. Staying
23 Count 3 under Rule 13 will inevitably subject Count 3 to merger and bar upon a final
24 judgment in the 2003 case, likely to be entered in January 2006. Where a plaintiff's motion
25 to amend the complaint to add claims is denied for dilatoriness, res judicata from the first
26 case to judgment, if otherwise applicable, will bar such claims when brought in a subsequent
27 suit. *Mpoyo v. Litton Electro-Optical Sys.*, No. 04-15047 (9th Cir. Dec. 5, 2005).

28

Counts 5, 6 and 7 would otherwise be stayed for the same reason. However, since the parties have fully briefed summary judgment arguments with respect to statutes of limitations on those counts and that defense is dispositive on the merits, the court will decide that motion.

The Lanham Act claim in Count 4 would not be stayed by Rule 13, as it is not necessarily part of the same transaction or occurrence as the claims in the 2003 action. *See* Fed. R. Civ. P. 13(a). The Complaint alleges that "Stabar made, and continues to make . . . misrepresentations to gain competitive advantage over its competitors which now includes Farnam." (Complaint at ¶ 97.) The claim is one for continuing conduct after the contractual transaction comprising the 2003 case.

## V.     Statute Of Limitations

Stabar alternatively argues that it is entitled to summary judgment on Farnam's claims for fraud, negligent misrepresentation, innocent misrepresentation, and unfair trade practices as barred by statutes of limitations.[1] (Stabar Motion at 11.)

### A.     Fraud

The statute of limitations for fraud in Arizona is three years. A.R.S. § 12-543; *Estate of Kirshenbaum v. Kirschenbaum*, 164 Ariz. 435, 437, 793 P.2d 1102, 1104 (App. 1989). A cause of action generally accrues under Arizona law according to the "discovery rule," meaning when "the plaintiff knows or with reasonable diligence should know the facts underlying the cause." *Doe v. Roe*, 191 Ariz. 313, 322, 955 P.2d 951, 960 (1998). Section 12-543 explicitly mandates that "[f]or relief on the ground of fraud or mistake, [the] cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of

---

[1] The statute of limitations issues raised in these motions have some similarity to the timeliness considerations bearing upon this court's denial of Farnam's motion to amend to bring these claims in the earlier case and its denial of Farnam's later motion to consolidate the two cases. This court has reconsidered on its own initiative both those rulings in light of the study it has given to the statute of limitations issues raised in these motions. That further study leaves this court convinced that the earlier rulings were correct and need not be changed.

- 12 -

the facts constituting the fraud or mistake." A.R.S. § 12-543(3). Despite this narrowing language, accrual of fraud claims are treated under the same rubric as accrual of other causes of action. The "statute of limitations, A.R.S. § 12-543, has been interpreted to begin running when the defrauded party discovers or with reasonable diligence could have discovered the fraud." *Mister Donut of Am. v. Harris*, 150 Ariz. 321, 323, 723 P.2d 670, 672 (1986) (citations omitted); *accord Richards v. Powercraft Homes, Inc.*, 139 Ariz. 264, 265, 678 P.2d 449, 450 (App. 1983) (citations omitted), *modified on other grounds*, 139 Ariz. 242, 678 P.2d 427 (1984). "The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry." *Coronado Dev. Corp. v. Superior Ct.*, 139 Ariz. 350, 352, 678 P.2d 535, 537 (App. 1984) (citing *Nat'l Auto. & Cas. Ins. Co. v. Payne*, 67 Cal.Rptr. 784, 261 Cal.App.2d 403 (1968)). "As such, it may begin to run before a person has actual knowledge of the fraud or even all the underlying details of the alleged fraud." *Mister Donut*, 150 Ariz. at 323, 723 P.2d at 672 (citations omitted).

The parties dispute when Farnam was placed on inquiry notice so as to accrue Farnam's claim of fraudulent inducement. Stabar alleges that Farnam was on inquiry notice as of the parties' 1999-2000 negotiations because Farnam was informed at that time of facts suggesting the patent was invalid. Farnam responds that it had no reason to suspect fraud until Barbara Allen's 2005 testimony, which allegedly provided new information triggering Farnam's suspicions.

Under Arizona law, inquiry notice for fraud claims generally arises upon apprehension of facts materially adverse to the potential claimant's interest. *See, e.g.*, *Guerin v. Amer. Smelting & Refining Co.*, 28 Ariz. 160, 171, 236 P. 684, 687 (1925) (holding that a defendant's statement to claimant that claimant could not legally own as a non-American any part of the property claimant had inherited "should have been a notice and warning to [the claimant] to investigate the situation" and that therefore the fraud claim against the defendant had accrued). Inquiry notice for contractual fraud claims, more specifically, arises when a claimant obtains knowledge of facts suggesting that the defendant has acted or is acting in

1 a way materially inconsistent with the claimant's contractual expectations. *See Rhoads v.*
2 *Harvey Publ'ns., Inc.*, 145 Ariz. 142, 147, 700 P.2d 840, 845 (App. 1984); *Richards*, 139
3 Ariz. at 265, 678 P.2d at 450; *Hadra v. Herman Blum Consulting*, 632 F.2d 1242, 1247 (5th
4 Cir. 1980). In *Richards*, for example, fraud claims brought by the purchasers of houses
5 against the builder accrued when the purchasers obtained knowledge that the houses were
6 seriously defective. *Richards*, 139 Ariz. at 265, 678 P.2d at 450. Like Farnam, the *Richards*
7 purchasers had filed a complaint but alleged that they did not discover the facts on which
8 their fraud claims were based until a later hearing. *Id.* at 266, 451. The court held that the
9 purchasers' knowledge of the building defects had placed them on inquiry notice. *Id.* at 266,
10 451. The builder's failure to fulfill the purchasers' contractual expectations accrued the
11 purchasers' claims for fraud.

12 Similar are *Rhoads* and *Hadra*. In *Rhoads*, a cartoonist sued his publishing company
13 alleging that the company had fraudulently deprived him of the copyrights to his drawings.
14 The court held that contractual language printed on the cartoonist's paychecks, which
15 indicated inter alia that the paychecks were payment for the cartoonist's copyrights, placed
16 the cartoonist on inquiry notice "about his rights" and thus accrued his fraud claim. *Rhoads*,
17 145 Ariz. at 147, 700 P.2d at 845. If the cartoonist believed that he had retained the
18 copyrights upon entering his employment contract, the contractual language on his paychecks
19 indicating contrariwise was materially inconsistent with his expectations and accrued his
20 fraud claim.

21 *Hadra*, cited by the Arizona Court of Appeals in *Rhoads*, 145 Ariz. at 147, 700 P.2d
22 at 845, is also demonstrative. In *Hadra*, the defendant purchaser of an engineering
23 consulting firm brought a counterclaim against the seller for fraudulent inducement into the
24 contract. The court held that in the year after the sale, the purchaser's awareness that the
25 seller's projections "did not seem to be correct" and that "the firm was not generating as much
26 money as expected" accrued the purchaser's fraudulent inducement claim. *Hadra*, 632 F.2d
27 at 1247. Because such knowledge "should have been enough to cause a reasonably prudent
28 person to inquire further," the clock had starting ticking. *Id.*

- 14 -

Here, within three weeks of entering the License Agreement, the parties were in open and heated debate about their respective rights arising from that contract. (*See* Case # 05-CV-0503.) Farnam describes in its pleadings in the 2003 case how Stabar did not provide Farnam with what Farnam had bargained for and expected from the License Agreement. (*Id.*) Specifically, Stabar refused to disclose the Shed-Stop formula, an integral part of Farnam's expectation under the agreement and, Farnam contends, an absolute prerequisite for Farnam to fully benefit from the contract. (*Id.*) Moreover, Farnam allegedly discovered to its chagrin that many of the Original Products were merely conceptual and that Farnam would be required to expend significant sums in bringing the products to market. (*Id.*) Informed of such departures from what Farnam expected to receive under the License Agreement, any reasonable person in Farnam's position would have at that time inquired about his or her rights under the agreement.

*Richards*, *Rhoads*, and *Hadra* support this conclusion. Like the defective houses provided by the builder in *Richards*, here the transferred product was materially "defective." According to Farnam, because the patent did not disclose the precise Shed-Stop formula, it was basically worthless. Just as the *Richards* purchasers' knowledge of the houses' defects was sufficient such that "a reasonable person would be put on notice that he might have a claim against the builder," *Richards*, 139 Ariz. at 265, 678 P.2d at 450, Farnam's knowledge about the uselessness of the acquired patent rights put Farnam on notice that it might have a claim against Stabar. Like the cartoonist in *Rhoads*, moreover, Farnam knew that Stabar was viewing Farnam's rights under the contract differently than Farnam viewed them. Knowledge of the underlying different understanding about disclosure of the formula accrued Farnam's claim for fraud, just as knowledge of the underlying different understanding about ownership of the copyrights accrued the *Rhoads* cartoonist's fraud claim. Finally, the evidence of broken expectations was more clear here than in *Hadra*. The patent's worthlessness was more acutely disappointing than the *Hadra* claimant's vague realization that the seller's projections "did not seem to be correct" and that "the firm was not generating

as much money as expected." Farnam was placed on inquiry notice within weeks after the execution of the License Agreement.

The potential unfairness of belated claims of fraudulent inducement is discussed in *Guerin*:

> Parties cannot, by their seclusion from the means of information, claim exemption from the laws that control human affairs, and set up a right to open up all transactions of the past. The world must move on, and those who claim an interest in persons and things must be charged with the knowledge of their status and condition, and of the vicissitudes to which they are subject.

*Guerin*, 28 Ariz. at 173, 236 P. at 688. Farnam pursued the benefits of the License Agreement and the exclusive license of Stabar's patent for two years, investing significantly more money under the License Agreement during the second year than the first. (*See* Case # 05-CV-0503.) Farnam was throughout that time in possession of the patent, which Farnam only recently argues is facially and obviously invalid. (*Id.*) As suggested by *Guerin*, Farnam should "be charged with knowledge of the status and condition" of that patent and of the "vicissitudes to which" the patent "is subject," especially given that Farnam is a sophisticated party in the business of licensing intellectual property. Farnam cannot "claim an exemption from the laws that control human affairs," even if ascertaining those laws may require Farnam's contacting of an attorney. *See Guerin*, 28 Ariz. at 172, 236 P. at 687 (holding that plaintiff's fraud claim had accrued because "[a] letter to an attorney in Tucson any time after April, 1914, would have doubtless brought to her information of what was being done [with her property]").

**B.   Negligent Misrepresentation, Innocent Misrepresentation, And Lanham Act Claims**

Farnam has addressed the statutes of limitations issue for the claims of negligent misrepresentation, innocent misrepresentation, fraud and violation of the Lanham Act without distinguishing among them. Farnam does not suggest that the negligent misrepresentation or innocent misrepresentation claims accrued at a different time than the fraud claim and provides no separate authority or rationale for denying Stabar's motion as to these other claims. As Farnam also does not contest Stabar's calculation of the limitations

periods for these other claims, the court alternatively grants Stabar's motion with respect to Farnam's negligent misrepresentation and innocent misrepresentation claims. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 571 n.30 (1990).

With respect to Farnam's Lanham Act claim, the Complaint alleges that Stabar "continues to make" misrepresentations. (Complaint at ¶ 97.) Such a continuing violation would not be barred, at least as to damages within the statute of limitations.

## VI.    The Lanham Act Claim (Count IV)

Stabar moves to dismiss Count IV of the Complaint for failure to state a claim. That Count alleges that Stabar violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which reads:

> **§ 1125.    False designations of origin and false descriptions forbidden**
> (a) Civil action.
> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> . . .
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The Federal Circuit has read in a bad faith requirement for § 43(a) Lanham Act claims against patentees. "[B]efore a patentee may be held liable under § 43(a) for marketplace activity in support of its patent . . . the marketplace activity must have been undertaken in bad faith." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999). The additional requirement is the result of the interaction of federal patent law and the Lanham Act; patent owners' conditional privilege to make good faith statements in support of their patents protects even untrue statements, which would otherwise create liability under the Lanham Act. *See id.*

- 17 -

1    Farnam alleges that Stabar falsely represented that Stabar's Shed-Stop products were
2 "subject to a valid U.S. patent" and that Stabar knew its patent was invalid. (Complaint at
3 ¶¶ 93 and 94.) Nevertheless, the Complaint does not sufficiently allege that Stabar made a
4 "false or misleading" statement of fact as required by the Lanham Act. Patents are
5 presumptively valid under the law. 35 U.S.C. § 282. Even where a court determines that a
6 patent was obtained through inequitable conduct such as fraud on the Patent Office, the
7 patent is not technically invalidated. *Zenith*, 182 F.3d at 1349. Stabar's statements that its
8 Shed-Stop formula was the subject of a valid U.S. patent were therefore technically true and
9 did not violate the Lanham Act. This is the precise holding of *IMCS, Inc. v. D.P. Technology
10 Corp.*, 264 F. Supp. 2d 193, 197 (D.Pa. 2003). In that case the defendant alleged in
11 counterclaim that the plaintiff had intentionally failed to disclose relevant prior art to the
12 Patent Office, making plaintiff's patent invalid and unenforceable, but then advertised that
13 its software was protected by the patent, knowing that the patent was invalid. *Id.* at 195. The
14 court held that until a determination of patent invalidity is made, patents are considered valid
15 and enforceable, and therefore the counterclaim did not allege false or misleading statements
16 as required by 15 U.S.C. § 1125(a)(1). Farnam alleges nothing more in this case.

17    The application of what is false or misleading may be different between the fraud-on-
18 the-market theory of a § 43(a) Lanham Act claim and a fraudulent inducement claim in direct
19 negotiations. *IMCS* reflects the view, and this court agrees, that there is no meaningful
20 difference for advertising purposes between describing a product as patented and describing
21 it as validly patented, and either verbalization is insufficient for § 43(a). The difference in
22 words may or may not matter in the context of a specific patent licensing negotiation.

23 **VII.   Farnam's Motion For Summary Judgment**

24    The foregoing determinations on Stabar's Motion effectively dispose of Farnam's
25 motion for summary judgment. Farnam's motion for summary judgment on Counts 3-7 is
26 therefore denied.

27    IT IS THEREFORE ORDERED that Stabar's Partial Motion To Dismiss Or, In The
28 Alternative, For Summary Judgment Regarding Counts 3-7 (doc. # 39) is granted in part.

Counts 5, 6, and 7 are dismissed on the merits under the statutes of limitations. Count 4 is dismissed with prejudice for failure to state a claim upon which relief can be granted. Count 3 is stayed under Rule 13(a), Fed. R. Civ. P., pending final judgment in Case No. 03-0503-PHX-NVW.

IT IS FURTHER ORDERED that Farnam's motion for summary judgment (doc. # 59) is denied.

DATED this 8th day of December, 2005.

_____
Neil V. Wake
United States District Judge